UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| AUGUST DEKOCK, et al., | § | |
| | § | |
| VS. | § | CIVIL NO. M-07-30 |
| | § | |
| JANET NAPOLITANO | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the Court without a jury.[1]  Plaintiffs August Dekock, Jesus Sanchez, and Bobby Martinez brought suit against the Secretary of the Department of Homeland Security (DHS),[2] alleging that Defendant failed to promote them in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–34.

Plaintiffs are capable, experienced, and well-trained Border Patrol Agents.  In May 2005, Plaintiffs held first line supervisory positions, and all three applied for two openings as second line supervisors.  Plaintiffs were among 23 qualified candidates who were considered for promotion.  One of the two candidates ultimately selected was substantially younger than Plaintiffs, while the other was older than two of the three Plaintiffs.  Plaintiffs allege that the promotion of the younger applicant was the result of age discrimination.

The ultimate issue in this case is not whether Plaintiffs were well-qualified for the promotion, nor is it whether the "decision was the correct one, or the fair one, or the best one."  *Deines v. Tex. Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th

---

[1]  With the consent of the parties, the District Court referred this case to the undersigned for plenary handling pursuant to 28 U.S.C. § 636(c)(1).

[2] Plaintiffs initially filed suit against Michael Chertoff in his capacity as the Secretary of DHS.  Janet Napolitano now holds that position and, as such, is substituted as the Defendant.  FED. R. CIV. P. 25(d).

Cir. 1999).  A federal court is not a forum for second-guessing employment decisions. *Walton v. Bisco Indus.*, 119 F.3d 368, 372 (5th Cir. 1997).  Rather, the ultimate issue is whether Plaintiffs were not selected "*because of [their] age*."  29 U.S.C. § 623(a)(1) (emphasis added).

After carefully considering all the evidence, the arguments and briefing of counsel, and the applicable law, the Court finds that Plaintiffs have failed to prove that age was a motivating factor in their non-selection.  To the contrary, as explained further below, the evidence shows that the decision by Border Patrol officials was based on factors other than age, including the fact that the younger applicant was also well-qualified for the position and that he had excelled in his performance as a first line supervisor.

The Court will enter judgment in favor of the Defendant based on the following findings of fact and conclusions of law:

## I.  <u>FINDINGS OF FACT</u>[3]

The U.S. Border Patrol is part of the Customs and Border Protection (CBP) agency within DHS.  In May 2005, CBP listed two openings for Border Patrol supervisor positions on the USA Jobs website.  These openings were for a position called "Field Operation Supervisor" (FOS).  A FOS is a second line supervisor position, which carries

---

[3] All findings of fact set forth below are to be considered as conclusions of law, and vice versa, where appropriate.  The facts stated in this opinion are either undisputed or based on the Court's assessment of the credible evidence, including the testimony of witnesses and exhibits received in evidence.

a GS-13 grade level.  The two FOS positions were to be filled at the McAllen Station in the Rio Grande Valley Sector.[4]

To be qualified for the job, an applicant had to possess one year of experience at the GS-12 level, which in effect meant that he or she needed to have at least one year prior experience as a first line supervisor.  Applicants were also required to achieve a 70 percent or better score on a promotional assessment exam.  Among the applicants for these two FOS openings at the McAllen Station, 23 were found to meet the job qualifications and were considered for the positions.

At the time, the three Plaintiffs were all GS-12 level Supervisory Border Patrol Agents assigned to the McAllen Station, and they were otherwise qualified to be considered for the FOS positions.  Plaintiffs applied for the positions but were not selected.

All of the Plaintiffs were over 40 at the time of application; August Dekock was born in 1953, Jesus Sanchez was born in 1959, and Bobby Martinez was born in 1958. The applicants ultimately selected were Lazaro Alvarez, born in 1955, and Brett Pachciarz, born in 1972.  Alvarez was the second oldest of the 23 candidates (next to Plaintiff Dekock), while Pachciarz was the youngest.[5]  Two unsuccessful applicants, Melissa Lucio, born in 1965, and Julio Salinas, born in 1962, were subsequently

---

[4] The McAllen Station is one of nine CBP stations that make up the Rio Grande Valley Sector (which was called the McAllen Sector prior to a name change in 2005). The Rio Grande Valley Sector encompasses a large section of southeast Texas and includes the following stations: Brownsville, Corpus Christi, Falfurrias, Ft. Brown, Harlingen, Kingsville, McAllen, Rio Grande City, and Weslaco.

[5] Of the 23 qualified candidates who were considered, 8 (35%) were under 40 years of age and 15 (65%) were over the age of 40.

promoted to similar FOS positions in the Rio Grande Valley Sector.  Plaintiff Martinez was likewise later promoted to a FOS position.

The selection process involved the following key officials (listed in their order on the chain of command):

(1)        Lynne Underdown, the Chief Patrol Agent for the Rio Grande Valley Sector (Chief);

(2)        Reynaldo Garza, Deputy Chief Patrol Agent (Deputy Chief);

(3)        Cruz Rodriguez, Assistant Chief Patrol Agent (A-Chief);[6] and

(4)        Juan Lopez, Patrol Agent in Charge (PAIC) at the McAllen Station.

As chief of the sector, Underdown was the ultimate selecting official for the two FOS positions at the McAllen Station.

CBP's human resources office provided Chief Underdown with a packet containing the resumes from the 23 candidates who were found to be qualified for the two open FOS positions.  The resumes were created by the online application process and presented information about each candidate in a similar format.   Chief Underdown forwarded the packet to Deputy Chief Garza, who provided them to A-Chief Rodriguez, who in turn sent them to PAIC Lopez of the McAllen Station (where the positions would be filled).

Lopez reviewed the resumes and, with the help of his assistant, prepared a summary of the applicants' qualifications, which was referred to as a "matrix."[7]  The

---

[6]  Each sector typically has several A-Chiefs.  Rodriguez was the A-Chief with supervisory authority over the McAllen station (where the FOS positions were being filled).

[7]  Although Lopez did not testify at trial, Plaintiffs submitted his testimony from the Equal Employment Opportunity Commission (EEOC), which was admitted into

. . . continued on next page.

matrix was an informal document or chart that summarized information from the resumes for ease of reference; for example, it listed information such as each applicant's number of years with the Border Patrol and number of years as a supervisor. PAIC Lopez ultimately submitted four names to A-Chief Rodriguez as his recommendations for the two FOS positions. Although many of the 23 applicants were from different Border Patrol stations or sectors, all four agents recommended by Lopez were then working under his direction as first line supervisors at the McAllen Station.

Lopez explained that he did not find the matrix useful in making his selections because all the candidates had basically the same qualifications. His recommendations were based principally on his own experience in working with the candidates he recommended, which he believed was a better indicator than paper credentials in assessing a candidate's readiness to move up to a higher level position.

Lopez's recommendations were as follows (in his order of preference): (1) Melissa Lucio, (2) Julio Salinas, (3) Jesus Sanchez (Plaintiff), and (4) Bobby Martinez (Plaintiff). Although none of these candidates was ultimately selected for the two FOS positions open at that time, Melissa Lucio, Julio Salinas, and Plaintiff Bobby Martinez were all promoted (in that order) to FOS positions that opened later.[8]

_____

evidence with the agreement of the Defendant. In addition, Plaintiffs offered into evidence as exhibits other papers generated during the EEOC proceedings (which were rather voluminous); these were admitted without objection from Defendant. In deciding this case, the Court has reviewed and carefully considered all of this documentary evidence, along with the live testimony from the witnesses.

[8] Plaintiff Martinez testified that Lopez led him to believe that he (Martinez) was Lopez's first choice. However, Lopez clearly stated his order of preference (with Lucio first and Martinez fourth) and specifically explained his reasons for recommending the four in that order. Lopez's testimony is consistent with Rodriguez's recollection of

. . . *continued on next page.*

Based on his personal observations, Lopez felt that Lucio and Salinas were both ready to move up to a FOS position.  Although Lopez viewed both as "one hundred percent-type[s]," Lucio was his clear first choice; Lopez found her to be proactive and constantly performing at a high level.  Lopez also believed that Plaintiffs Sanchez and Martinez were solid choices based on their experience and performance; while he had some reservations about them, he felt that both were "trainable" for the FOS position.[9] On the other hand, Plaintiff Dekock did not make Lopez's "short list" because he did not feel that Dekock was qualified for the position.  While Dekock was a well-liked first line supervisor, Lopez believed that Dekock had reached his potential at that level.[10]

Plaintiffs presented evidence that Lopez had made negative comments regarding older border patrol agents, including comments directed at two of the Plaintiffs (although not in the context of the selection for the FOS positions).  On one occasion, Lopez said that younger employees would get yelled at if they kept putting in too much overtime, but

Lopez's preferences and also consistent with the order in which Lucio, Salinas, and Martinez were later promoted to FOS positions.

[9] Lopez's reservation about Plaintiff Sanchez was that his experience had been tied into one area of operations (the Border Patrol Criminal Alien Apprehension Program), as opposed to having a broader range of responsibilities.  But Lopez nevertheless believed that Sanchez was a capable supervisor who could carry out the task given him.  With regard to Plaintiff Martinez, Lopez stated that Martinez had some faults and did not always handle things 100 percent correctly, but these failings were nothing major and did not prevent tasks from being completed.  This is why Lopez recommended Martinez as his fourth choice for the two FOS positions.

[10] In Lopez's opinion, Dekock did not always handle situations properly.  Lopez gave as an example one matter that was the subject of a pending internal disciplinary investigation.  The internal investigation had not concluded at the time of Lopez's testimony, but Lopez nevertheless believed that Dekock had not handled the matter at issue properly.  Whether or not Dekock was in any way at fault in that instance is not an issue to be decided in this case, and the Court expresses no opinion on it.  The evidence presented at trial shows that Plaintiff Dekock has served honorably and well during his long career with the Border Patrol.

that "Jurassics" like Dekock would get fired.  On another occasion, Lopez, referring to Martinez, asked the question, "Why should I hire an old Jurassic like you when you won't be around to help me very long?"  The Court finds Plaintiffs' testimony about these statements to be credible.

Despite these comments, Lopez, who is older than any of the Plaintiffs, recommended two of the Plaintiffs for the FOS positions.[11]  In fact, all four of the individuals recommended by Lopez were members of at least one protected class: Salinas, Sanchez, and Martinez were all over 40 and thus members of the protected class for age; in addition, Lucio (his first choice) was not only a member of a protected class as a woman, but she had also turned 40 before the FOS positions were filled.[12]  In any event, as will be seen, it is undisputed that Lopez's recommendations were not followed and that he played no role in the selection process after submitting his recommendations to A-Chief Rodriguez.  None of the other officials involved in the selection process ever heard Lopez use the term "Jurassic" or make any other age-based comments, nor were they ever told (prior to this litigation) that Lopez had made such comments.

---

[11]  Lopez retired in January 2006, which was about six months after making his recommendations for the FOS positions.  Lopez denied using the term "Jurassic" in a derogatory manner about age.  He explained that he and others had begun using that term as first line supervisors to describe higher level supervisors who exercised their seniority privileges to monopolize the most desired vacation periods and other benefits.  Lopez and the other more junior supervisors were called the "little chicks" (who were presumably at the mercy of the "Jurassics").  But this rather innocent explanation for the origins of the use of the term "Jurassic" cannot justify the statements described by Plaintiffs that Lopez made in their presence.  While Lopez may have intended those comments to be jokes (as Plaintiff Sanchez candidly acknowledged), they could easily be interpreted as reflecting age-based discrimination and were clearly inappropriate for a supervisor.

[12]  She was over 40 when she was promoted to the next FOS opening a few months later.

Lopez presented the names of Lucio, Salinas, Sanchez, and Martinez to Rodriguez as his recommendations for the two FOS positions.  In presenting those names, Lopez may also have briefly explained his order of preference and why he was recommending each one.  Although Rodriguez was aware that Lopez had prepared a matrix reflecting information from the applications, it is unclear whether Lopez gave Rodriguez a copy of the matrix along with the names.[13]  A copy of Lopez's matrix could not be found in connection with this litigation.  There was no policy in place that would have required either Lopez or Rodriguez to preserve a copy of the matrix, which was an informal tool that neither of them claims to have relied upon in making their selections.

In addition to receiving Lopez's recommendations, Rodriguez made separate recommendations of his own.  In doing so, he relied on his personal experience with some of the applicants and on his review of the resumes that were submitted.  At the time, Rodriguez had been a supervisor with the Border Patrol for about 18 years.  Rodriguez recommended two candidates for the FOS positions, Lazaro Alvarez and Brett Pachciarz.  As noted, Alvarez was the second oldest of the 23 applicants and Pachciarz was the youngest.

Like Lopez, Rodriguez recommended officers who he had personally observed performing their duties as first line supervisors.  In particular, Rodriguez had almost daily contact with Pachciarz.  Rodriguez observed Pachciarz's performance in planning and

---

[13]  Lopez probably did provide Rodriguez with a copy of the matrix.  Deputy Chief Garza recalled that Lopez had forwarded a matrix, and Garza would have received it from Rodriguez when Rodriguez later forwarded his and Lopez's recommendations to Garza.  Ultimately, it is not significant whether or not Lopez's matrix was forwarded to Rodriguez or Garza since no one relied on it in making the FOS selections.  Plaintiffs' argument that the use (or non-use) of the matrix is circumstantial evidence of age discrimination is addressed further in the conclusions of law.  *See infra* Part II.B.2.b.

implementing the objectives of Operation Rio Grande, a major Border Patrol initiative being operated out of the Ft. Brown Station (where Pachciarz was assigned).[14] Rodriguez found that Pachciarz consistently performed at a high level and that he was ready for promotion to a FOS position.  To a somewhat lesser extent, Rodriguez had also personally observed Alvarez performing his duties as a supervisor at the Rio Grande City Station and found that Alvarez likewise excelled in that role.  In contrast, while Rodriguez knows the Plaintiffs and has had some interaction with them, he had no significant opportunity to personally observe their performance as supervisors.

Rodriguez based his recommendations of Pachciarz and Alvarez almost entirely on his personal observations of their performance.  Beyond reading the resumes of other candidates, Rodriguez did not take any other steps to obtain additional information about candidates that he did not know well (such as contacting their supervisors).  Lopez's matrix would have been available to him, but Rodriguez did not rely on Lopez's matrix or prepare a matrix of his own.

Rodriguez submitted his recommendations, along with Lopez's recommendations, to Deputy Chief Garza and Chief Underdown.  Underdown was the selecting official, and she ultimately decided who would be promoted to the two open FOS positions.

At the time the positions were posted, Underdown had very recently transferred to the Rio Grande Valley Sector from Miami, Florida, where she had been a sector chief for

---

[14]  Operation Rio Grande was originally conducted from the Port Isabel Station. Pachciarz played a significant role in carrying out the transfer of the operation's headquarters from the Port Isabel Station to the Ft. Brown Station, which was a newly-constructed station that is much closer to the border.

six years.  These were the first FOS openings during her tenure as chief of the Rio Grande Valley Sector.

After she arrived in the Rio Grande Valley Sector, Chief Underdown expressed to her senior staff certain preferences in handling promotions to supervisor positions.  One of those was that the agent in charge (PAIC) at the station where the position was being filled should prepare what she called a "matrix" as an aid in assessing candidates.  The matrix was supposed to be approved by the assistant chief (A-Chief) with responsibility for that station.  Underdown had started using a matrix in Miami and found it to be helpful.  While the term "matrix" might suggest some level of precision or formality, it was simply an informal tool used to organize and summarize the information from applicants' resumes.  Underdown explained that there were no particular requirements for what the matrix should look like (for example, it could be hand-written or computer-generated) or what information it should include.  It could take any form that was helpful in organizing the information.

Another preference Underdown expressed to her senior staff was that FOS positions should not automatically be filled by an applicant from the same station.  To the contrary, she believed it was often beneficial to bring in someone from other stations who would come with new ideas and different perspectives.  In this way, she believed that supervisors at each station would have a better appreciation of how the work of that station fit into the sector as a whole (or, as she put it, "the entire machine versus one spoke in the wheel").  Underdown referred to the practice of bringing in supervisors from outside-station as "cross-pollination," and she expressed her desire to consider the possible benefits of cross-pollination in selecting supervisors.  There was a consensus

among her senior staff that the McAllen Station in particular could benefit from bringing in supervisors from other stations.

At the time Underdown took over as chief, the Rio Grande Valley Sector had over 1,500 employees, most of whom she did not know. As such, she relied heavily on her senior staff in selecting supervisors. As the A-Chief responsible for the McAllen Station, Rodriguez was the key senior staff person for the FOS selections at issue here. Based on her dealings with Rodriguez, Underdown had developed a high level of confidence in him, as shown by the fact that she appointed Rodriguez to be acting deputy chief when Deputy Chief Garza was absent on assignment to another sector.

After receiving the recommendations made by Rodriguez and Lopez for the two FOS openings at the McAllen Station, Underdown met with Garza and Rodriguez.[15] Rodriguez explained the reasons for his recommendations, which Garza concurred with.[16] Rodriguez stated that he had personally observed both Alvarez and Pachciarz as first line supervisors and found their performance to be exceptional. There may also have been some brief discussion about why Rodriguez believed his recommendations should be accepted rather than Lopez's; at the very least, Underdown was certainly aware that all four of the people recommended by Lopez were then supervisors at the McAllen Station. While she understood Lopez's desire to motivate his officers by promoting within his own station, she did not feel that this would necessarily be in the best interests of the service.

---

[15] Lopez did not attend this meeting; in fact, he had no involvement in the selection after providing his recommendations to Rodriguez.

[16] Other than agreeing with Rodriguez's recommendations, Garza played no other significant role in the selection process.

Underdown decided to accept the recommendations made by Rodriguez, who, as noted, was her key senior staff officer for this selection.  To validate her decision to accept Rodriguez's recommendations, Underdown reviewed the resumes of Alvarez and Pachciarz.  She noted that both of these candidates would bring the benefits of cross-pollination, since they would be coming to the McAllen Station from other stations in the sector.

With regard to Pachciarz, she noted that in addition to his recent experience at the Ft. Brown Station, he had also previously been a supervisor at the Sierra Blanca Station, which is a busy checkpoint station in another sector.  Underdown was familiar with the nature of the work at the Sierra Blanca checkpoint because she had previously worked there herself, and she believed that Pachciarz's experience there would further add to the cross-pollination effect he could bring to the McAllen Station.  Satisfied that Rodriguez's recommendations were consistent with her vision for the sector, Underdown approved the selection of Alvarez and Pachciarz.  She did not review any of the resumes of the other candidates.

After the selections became known, Plaintiffs filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging age discrimination.  At the conclusion of the EEOC process, this lawsuit followed.  Plaintiffs do not complain about the selection of Lazaro Alvarez, who is older than two of the Plaintiffs, but they do complain about the selection of Brett Pachciarz, who is substantially younger than all the Plaintiffs.  Plaintiffs contend that Chief Underdown and/or A-Chief Rodriguez discriminated against them based on their age in promoting Pachciarz.

Based on all the evidence, direct and circumstantial, the Court finds that none of the Border Patrol officials involved in the selection process were motivated by Plaintiffs' ages in selecting Pachciarz for the FOS position at the McAllen Station.   Chief Underdown was an EEO counselor for six years during her Border Patrol career, and there is absolutely no evidence that age discrimination was a motivating factor in her decision.   In fact, the evidence shows that she did not know the Plaintiffs and was unaware of their ages.

Likewise, the evidence does not support the conclusion that A-Chief Rodriguez, on whose recommendation Underdown relied, chose Pachciarz over the Plaintiffs because of their ages.   Rodriguez also recommended the selection of Alvarez, who was the second oldest of the 23 applicants.   The Court finds credible Rodriguez's testimony that he chose Pachciarz because Rodriguez believed, based on his own observation of Pachciarz's performance, that Pachciarz was well-qualified for the promotion and that he was the best person for the FOS position at that time and place.

The Court further finds that Plaintiffs' evidence of age discrimination is unpersuasive for the reasons discussed in detail in the conclusions of law that follow.

## II.  CONCLUSIONS OF LAW

Plaintiffs allege that Defendant violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34.   The ADEA prohibits discrimination in pubic and private employment against individuals who are age 40 or older.   *Id* at §§ 623(a)(1), 631(a).   This prohibition against age discrimination applies to the employment of the CBP Border Patrol Agents who are Plaintiffs in this case.   *Id* at § 633a(a).

13

"The ultimate question in every employment discrimination case . . . is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).  A plaintiff must show that his employer took the challenged employment action "because of such individual's age."   29 U.S.C. § 623(a)(1); *see also* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Civil), § 11.9.1 (West 2006) (plaintiff must prove that the defendant took the action "because of Plaintiff's age").   It follows that to prevail on a claim of age discrimination, the plaintiff has the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."   *Reeves*, 530 U.S. at 143 (quoting *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).[17]

"The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."   *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).  Put another way:

> Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the [trier of fact's] province to decide. The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination.

*Deines v. Tex. Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  As the Fifth Circuit has emphasized, "the discrimination laws [are not] vehicles for judicial second-

---

[17]   However, it should also be noted that a plaintiff "is not required to establish that his age was the sole reason" for the employment action; rather, he "must prove that age actually played a role in and had a determinative influence on the employer's decision-making process."  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003) (quoting *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997)) (internal quote omitted).

guessing of business decisions."  *Walton v. Bisco Indus.*, 119 F.3d 368, 372 (5th Cir. 1997) (citation omitted).

Age discrimination may be proven by direct or circumstantial evidence.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). Whether direct or circumstantial, "[t]he trier of fact should consider all the evidence, giving it whatever weight and credence it deserves."  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983).

In attempting to prove intentional discrimination by circumstantial evidence, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S. at 147 (citation omitted).  "[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."  *Id.* (quoting *Hicks*, 509 U.S. at 511) (emphasis in original).  At the same time, "[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."  *Id.* (quoting *Hicks*, 509 U.S. at 519) (emphasis and omissions in original).[18]

_____

[18]  As the Supreme Court explained, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'"  *Id.* (quoting *Hicks*, 509 U.S. at 524) (omission in original).

Here, Plaintiffs have presented both direct and circumstantial evidence.  Their direct evidence of age discrimination consists solely of PAIC Lopez's remarks about "Jurassic" officers.  In attempting to show that the reasons given for their non-selection were a pretext for age discrimination, Plaintiff's offer circumstantial evidence in support of two principal contentions: (1) they claim that they were "clearly better qualified" than the younger person selected, Pachciarz; and (2) they claim that the reasons given for Pachciarz's selection were false or otherwise "unworthy of credence" in various ways.[19] *See Burrell*, 482 F.3d at 412 (addressing similar claims of pretext).

Defendant argues that Plaintiffs have failed to prove intentional discrimination.  Before addressing the sufficiency of Plaintiffs' evidence of age discrimination, it should be noted that Defendant also contends that, even if age discrimination had been shown, at most only one of the Plaintiffs would be entitled to recover damages.  Defendant points out that only one of the three Plaintiffs could have

---

[19]  At the summary judgment stage, Plaintiffs disclaimed reliance on Lopez's "Jurassic" remarks and thus relied solely on circumstantial evidence.  Accordingly, the Court applied the well-known *McDonnell Douglas* burden-shifting framework (as modified by the Fifth Circuit) in deciding Defendant's motion for summary judgment. *See Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973)).  At this stage, however, it is unnecessary to address the case in the context of that framework.  "Because this case was 'fully tried on the merits,' the *McDonnell Douglas* burden-shifting frame work 'drops from the case.'"  *Arismendez v. Nightingale Home Health Care, Inc*., 493 F.3d 602, 607 (5th Cir. 2007) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14 (1983)); *see also West v. Nabors Drilling USA, Inc*., 330 F.3d 379, 385 (5th Cir. 2003) ("When a case has been fully tried on the merits, we do not focus on the *McDonnell Douglas* burden-shifting scheme as such.").  The Court denied Defendant's motion for summary judgment, finding that Plaintiffs' circumstantial evidence, taken together, raised a genuine issue of material fact on the ultimate issue of intentional discrimination.  However, a different standard applies at trial.  As explained above, the issue now is whether Plaintiffs have proved that they were the victims of intentional discrimination based on age.  *See Reeves*, 530 U.S. at 153.

16

been selected for the one FOS opening at issue.  Indeed, if Pachciarz had not been selected, one of the other 19 applicants may well have been chosen instead of any of the Plaintiffs; for example, Lucio was Lopez's clear first choice, and she was in fact selected for the next FOS opening.  For the reasons that follow, however, it is unnecessary to resolve that issue.

## A.    Direct Evidence of Discrimination

Plaintiffs contend that PAIC Lopez's negative comments about old "Jurassic" employees is direct evidence of discrimination.  Defendant responds that even if Lopez made the remarks, he was not the decision-maker and, in any event, his recommendations show that he did not engage in age discrimination.

"[F]or comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [employment action]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'"  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222 (5th Cir. 2001) (quoting *Krystek v. Univ. of S. Miss*., 164 F.3d 251, 256 (5th Cir. 1999)). While Lopez's comments may satisfy the first two requirements,[20] they fail to meet the last two.

Beginning with the fourth requirement, Plaintiffs do not suggest that Lopez made his "Jurassic" comments in connection with the selection for the FOS position.  In

---

[20]  Although it is unclear how close in time Lopez's comments were to the FOS selections, it will be assumed that they were sufficiently proximate to be relevant.

addition, and more importantly, Lopez was not "an individual with authority over the employment decision" within the meaning of the third requirement.

"To be probative, allegedly discriminatory statements must be made by the relevant decision maker." *Nichols v. Loral Vought Sys. Corp*., 81 F.3d 38, 41–42   (5th Cir. 1996) (citation omitted).  In determining who is a relevant decision maker, the court must look beyond the formal decision maker to a person "who actually made the decision or caused the decision to be made" or to someone who "exerted influence" over the decision maker.  *Arismendez v. Nightingale Home Health Care, Inc*., 493 F.3d 602, 608 (5th Cir. 2007) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2001)).

Here, Lopez does not meet any of the criteria for a relevant decision maker in the context of this selection.  While he made recommendations for the FOS positions, he had no involvement in the selection process after that point, and it is undisputed that his recommendations were not followed.[21]   The selecting official, Chief Underdown, accepted the recommendations of A-Chief Rodriguez instead.

Moreover, notwithstanding his comments, Lopez's recommendations for the FOS position are inconsistent with any intent to discriminate on the basis of age (or any other impermissible basis for that matter).  It is significant that Lopez actually recommended two of the Plaintiffs for the FOS positions.[22]  Beyond that, as previously noted, all four of

---

[21]  Lopez was disappointed that none of his recommendations were selected, and he noted that he had not even received a courtesy call informing him about who was ultimately selected.

[22]  It is also somewhat ironic that one of Plaintiffs' contentions is that the decision to ignore Lopez's recommendations is evidence that other officials engaged in age discrimination.

the names on Lopez's list were members of a protected class: Salinas, Plaintiff Sanchez, and Plaintiff Martinez were all over 40 and in the protected class for age, while Lucio was likewise a member of a protected class as a woman (and she had also turned 40 before the FOS selectees came on duty).

In short, Plaintiffs' proffered direct evidence of discrimination is both insufficient and unpersuasive.[23]

## B.    Circumstantial Evidence

### 1.    Clearly Better Qualified

Plaintiffs attempt to prove that the selection of Pachciarz was a pretext for discrimination by showing that they were clearly better qualified for the FOS position. Each of the Plaintiffs expressed his opinion that his qualifications far exceeded those of Pachciarz and that therefore Pachciarz must have been selected as a result of age discrimination.  All three Plaintiffs further opined that they should have been selected over any of the other 21 candidates, including each other.  Defendant argues that Pachciarz was selected based on legitimate, non-discriminatory reasons.

"A fact finder can infer pretext if it finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected." *See E.E.O.C. v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995). In other words, "[i]f . . . the passed over applicant who is protected against discrimination

_____

[23]  This conclusion can hardly come as a surprise to Plaintiffs since at the summary judgment stage they disclaimed reliance on Lopez's comments (presumably recognizing the points made above).  Defendant objected to the admission of the statements at trial, but the Court found them to be admissible under the Federal Rules of Evidence and overruled the objections.  In the interest of fully considering all evidence of discrimination in deciding the case, the Court did not hold Plaintiffs to their prior disclaimer of reliance on Lopez's statements.

is clearly better qualified for the position in question, a finding of pretext masking discrimination can be supported by the promotion of the less qualified person." *Odom v. Frank*, 3 F.3d 839, 845–46 (5th Cir.1993).

To show that their non-selection was a pretext for discrimination, the Plaintiffs must show that the "disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Tex. Dep't. of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999). "It is hardly a basis for the [trier of fact] to find mendacity on the part of the employer when its judgments on qualifications are somewhere within the realm of reason." *Id*. at 282. Showing that two candidates are similarly qualified does not establish pretext under this standard. *See Odom*, 3 F.3d at 846 (holding that district court's finding of age discrimination was clearly erroneous where plaintiff and successful candidate were "similarly qualified"). Evidence that a plaintiff was clearly better qualified "must be more than merely subjective and speculative." *Eberle v. Gonzales*, 240 Fed. Appx. 622, 630 (5th Cir. 2007) (quoting *Nichols v. Loral Vought Sys. Corp*., 81 F.3d 38, 42 (5th Cir. 1996)) (unpublished).[24]

---

[24] The Fifth Circuit had previously used the following "colloquial expression" in describing the proper standard: "*unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face*, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question." *Deines*, 164 F.3d at 280 (emphasis in original). In *Ash v. Tyson Foods, Inc*., 546 U.S. 454 (2006), the Supreme Court rejected the "jump off the page" standard because it is "unhelpful and imprecise," but the Court declined to "define more precisely what standard should govern pretext claims based on superior qualifications." *Id*. at 457. Since *Ash*, the Fifth Circuit has reaffirmed the continued validity of the more precise "clearly better qualified"

. . . *continued on next page.*

In determining whether Plaintiffs were clearly better qualified than Pachciarz, the starting point is the nature of the position and the qualifications that were required by the employer. CBP's notice for the FOS positions identifies two key qualifications: (1) candidates must have scored at least 70 or better on the supervisor's promotional assessment exam; and (2) candidates must have had at least one year's experience at the GS-12 level (or the equivalent). The requirement for prior experience at the GS-12 level in effect meant that qualified candidates for the FOS position must have already been first line supervisors for at least one year. The candidates selected for the FOS positions would be become second line supervisors; in other words, they would supervise the first line supervisors.

The CBP human resources office reviewed the on-line applications and forwarded to Chief Underdown the names and resumes of the 23 applicants who met the qualifications for the FOS positions. This is not a case in which the person selected, Pachciarz, failed to meet the minimum requirements but was selected anyway. *See, e.g.*, *Gillaspy*, 278 Fed. Appx. at 314 (holding that the plaintiff's evidence of her qualifications created a fact issue regarding pretext for gender discrimination where three men selected for the same position did not meet the minimum education and experience requirements

---

standard as articulated elsewhere in *Deines* (and quoted in the text above). *Gillaspy v. Dallas Independent School Dist.*, 278 Fed. Appx. 307, 313–14 (5th Cir. 2008) ("We are confident that [the] standard [stated in *Deines*] comports with the directive in *Ash* to formulate a better standard to govern pretext claims based on superior qualifications, and we apply it here.") (unpublished); *see also Eberle v. Gonzales*, 240 Fed. Appx. 622, 630 n. 6 (5th Cir. 2007) ("The 'clearly better qualified' standard for showing pretext by comparison to the preferred employee has survived the Supreme Court's recent rejection, in *Ash* . . ., of the 'slap you in the face' standard previously used by the Fifth Circuit.") (unpublished).

established by defendant) (unpublished).  In fact, both Pachciarz and the Plaintiffs far exceeded the minimum qualifications for the position.

Plaintiffs claim that they were clearly better qualified than Pachciarz in two primary ways: (1) experience (including years in the Border Patrol and years as a supervisor), and (2) performance awards.  Although not emphasized by Plaintiffs, qualifications reflected on the applicants' FOS resumes included other factors such as education, training, and language ability.

The FOS resumes of the Plaintiffs and Pachciarz listed the following key qualifications:

**Dekock**
- **Supervisory Experience**:  6 years[25] (all at McAllen Station)
- **Time in Border Patrol**:  19 years
- **Education**:  "Some College Coursework" at Pan American University
- **Border Patrol Training**:  7 courses completed
- **Language**:  Spanish, intermediate
- **Awards**:  12 (9 "Outstanding" yearly ratings, one with a cash award; 2 letters of appreciation; 1 meritorious achievement award)

**Sanchez**
- **Supervisory Experience**:  8 years (all at McAllen Station)
- **Time in Border Patrol**:  20 years
- **Education**:  "Some College Coursework" at Laredo Jr. College and St. Edwards University
- **Border Patrol Training**:  10 courses completed
- **Language**:  Spanish, advanced, Portuguese, novice
- **Awards**:  11 (8 "Outstanding" and 2 "Excellent" yearly ratings, with 3 of the ratings accompanied by cash awards and 1 with a letter of commendation; 1 special achievement award)

**Martinez**
- **Supervisory Experience**:  5.5 years[26] (all at McAllen Station)

---

[25]  Based on information in the resumes, the years of supervisory experience and years in the Border Patrol reflected in this summary are calculated as of August 2005, which was when the FOS selections were made.

- **Time in CBP**:  22.5 years
- **Education**:  High School Diploma
- **Border Patrol Training**:  21 courses completed
- **Language**:  Spanish, advanced
- **Awards**:    23 (13 "Outstanding" yearly appraisals; 3 letters of commendation; 4  letters of appreciation; 3 special achievement awards)

**Pechciarz**
- **Supervisory Experience**:   4.5 years (Sierra Blanca Station and Fort Brown Station)
- **Time in CBP**:  10 years
- **Education**:  115 semester hours completed toward a degree in Criminal Justice at Indiana University-Purdue University Indianapolis
- **Border Patrol Training**:  27 CBP courses completed
- **Language**:  Spanish, advanced
- **Awards**:  2 (1 "Outstanding" yearly rating; 1 certificate of appreciation)

In addition, of course, the selecting officials were not limited to the information listed on the FOS resumes; they also could—and did—rely on their own personal observations and experience with the candidates.  Plaintiffs' claims that they were clearly better qualified based on their experience and performance awards will be considered in light of all the evidence.

      a. *Experience*

Plaintiffs emphasize that they are far more experienced than Pechciarz.  Indeed, they all have about twice as much total time in the Border Patrol as he does, which

---

[26]  According to his FOS resume, Plaintiff Martinez was actually promoted to a GS-12 position in March 1997; however, for the first two and a half years at that level, he was in a non-supervisory role as a special agent in an anti-smuggling unit.  In addition, after transferring to the McAllen Station, where he was a first line supervisor, Martinez later spent six months detailed as a Public Information Officer, which was a position that likewise did not involve supervising anyone.  While these experiences are no doubt valuable and impressive, the three years he was involved in those activities were not counted here since they did not involve supervisory responsibilities.  The experience counted in this category for the other Plaintiffs and Pachciarz was all time spent in a supervisory role.

amounts to a difference of about ten years.  While experience is valuable and should be taken into account in determining qualifications, there is no evidence in the record to show that Plaintiffs' greater number of total years in service makes them better qualified (let alone clearly better qualified) to perform the duties of a second line supervisor.  The mere fact that someone has been in the Border Patrol a long time says little (if anything) about their capacity to function effectively as a higher level supervisor.  *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996) (An "attempt to equate years served with superior qualifications . . . [is] unpersuasive.").  Plaintiffs' experience as supervisors is more relevant to that issue.

Contrary to Plaintiffs' suggestion that they had far more supervisory experience, the actual difference in Plaintiffs' and Pachciarz's experience as supervisors is relatively insignificant.  Pachciarz had about four and a half years experience as a supervisor at the time he was selected for the FOS position.  That was only about one and a half years less than Dekock, three and a half years less than Sanchez, and one year less than Martinez.[27] *See supra* Part II.B.1 and notes 25–26.  Just like the Plaintiffs, Pachciarz's experience as

---

[27]  It appears that Plaintiffs' belief about Pachciarz's relative lack of supervisory experience is based (at least in part) on their initial misunderstanding of his actual experience.  As noted, at the time of his selection, Pachciarz had served as a supervisor for four and a half years at two different stations (in two sectors).  But Plaintiffs Sanchez and Martinez both believed that Pachciarz had only two years experience as a supervisor—which understated Pachciarz's actual experience by one half.  Martinez repeated this error in his testimony at trial.  It is hard to understand how Martinez could have still believed at trial that Pachciarz had only two years experience as a supervisor, since the correct information was provided to Plaintiffs in connection with this litigation—and indeed that information was reflected on exhibits that Plaintiffs offered into evidence at trial.  Plaintiff Dekock also testified that Pachciarz was not close to him in terms of experience and other factors, yet Dekock had been a supervisor only about a year and a half longer than Pachciarz had.

a supervisor was far in excess of the amount required to qualify for a FOS position (which was only one year).

The reason that there is a big difference between Pachciarz and the Plaintiffs in total years in service but a much smaller difference in experience as a supervisor is that Pachciarz was promoted to a first line supervisor position at a relatively early stage in his career (compared to other agents at that time).[28]  This suggests that a different set of supervisors (in a different sector) had found that his performance and competence merited such early advancement.[29]

Both Pachciarz and the Plaintiffs were well qualified for the FOS position by virtue of their number of years experience as first line supervisors.  Given that their experience as supervisors was similar, their relative level of performance is a key factor in comparing qualifications.[30]

     b.    *Awards*

On that issue, Plaintiffs all emphasize that they have received significantly more "awards" than Pachciarz.  Dekock lists 12 awards, Sanchez 11, and Martinez 23, while Pachciarz lists just 2.  The awards listed by Plaintiffs reflect very well on them and their

---

[28]  With the large increase in the number of Border Patrol agents in more recent years, it is now more common for agents to be promoted earlier in their careers.

[29]  Pachciarz was promoted to a first line supervisor position in February 2001. None of those involved in the FOS selection were involved in Pachciarz's 2001 promotion, which occurred in a different sector.  Plaintiffs have not suggested that Pachciarz was the beneficiary of age discrimination by different selecting officials at the time of his 2001 promotion.

[30]  As the Fifth Circuit noted in *Nichols*, "greater experience alone will not suffice to [show] whether one person is clearly more qualified than another.  More evidence, such as comparative work performance, is needed."  *Nichols*, 81 F.3d at 42 (citing *Bodenheimer v. PPG Indus., Inc*., 5 F.3d 955, 959 (5th Cir. 1993)).

careers with the Border Patrol, but what they say about their qualifications for the FOS position is the relevant issue here.

Most of the "awards" that Plaintiffs listed on their FOS resumes are the ratings that were given to them during their yearly annual appraisals.[31]  Plaintiffs listed an "award" when their annual performance rating was either "outstanding" or "excellent."[32] Pachciarz did not follow that approach on his resume.  While he testified that he received either an excellent or outstanding rating each year he was in the Border Patrol, Pachciarz listed only one outstanding yearly rating on his FOS resume.  Assuming that both Plaintiffs and Pachciarz received mainly outstanding or excellent annual ratings each year, the difference in the number of "awards" they could have listed based on these ratings would simply reflect the difference in their years in service with Border Patrol. *See Odom v. Frank*, 3 F.3d 839, 846 (5th Cir.1993) (concluding that the plaintiff and the successful candidate were "similarly qualified," despite plaintiff's advantage in "raw numbers" resulting from his "greater length of time" working for the employer).

Neither Plaintiffs nor Pachciarz could have listed an outstanding or excellent rating for the most recent appraisal period before the FOS selections.  That is because the Border Patrol changed its annual appraisals to a pass/fail system.  In evaluating the significance of the yearly ratings for purposes of the FOS selection, it is relevant that the Border Patrol itself had abandoned the prior rating system in evaluating its employees.

---

[31]  At the time, all Border Patrol Agents received one of the following ratings during their annual appraisals: outstanding, excellent, satisfactory, and unsatisfactory.

[32]  For Dekock, 9 of the 12 awards he lists were his annual rating for that year; for Sanchez, 10 of 11 awards were annual ratings; and for Martinez, 13 of 23 awards were annual ratings.

Some of the awards listed by Plaintiffs were not yearly ratings.  But it is difficult to assess the significance of these other types of awards in the context of the selection for the FOS positions.  For example, 10 of the awards listed by Martinez were special achievement awards, letters of appreciation, and letters of achievement.  Of these 10 awards, he received 5 of them in a single year, 1987, which was about 18 years before the FOS selections.  The other 5 of these awards were all received before 1990, again many years before the FOS selections.

When PAIC Lopez reviewed the FOS resumes, he did not place any significant reliance on the awards listed by the applicants.  In his experience, supervisors took different approaches to giving yearly ratings.[33]  Although Lopez recommended both Plaintiffs Sanchez and Martinez for the FOS positions, it was not because they listed many awards on their resume, but rather it was because he knew from his personal experience with them that they could handle the FOS position.  While Lopez did not recommend Pachciarz, he refused to agree with the proposition that Pachciarz was less qualified based on the fact that he listed fewer awards compared to the Plaintiffs; rather, Lopez had never worked with Pachciarz and chose to recommend candidates from his own station who he knew from personal experience could handle the position.

This is essentially also what A-Chief Rodriguez did, except that he did have the opportunity to observe Pachciarz's and Alvarez's performances as first line supervisors. In particular, Rodriguez had almost daily contact with Pachciarz and saw first hand how

_____

[33]  For example, Lopez believes that some supervisors gave high ratings in order to avoid dealing with an employee who might contest a less than stellar rating.

he carried out his duties.   Like Lopez, Rodriguez principally relied on his own observation and assessment in making his recommendations.

As can be seen, both of the key recommending officials for the FOS selections believed that their personal observation of a candidate's performance as a first line supervisor was a better indicator of their qualifications than the number of awards the candidate listed on his or her resume.[34]  Such an approach is not unreasonable, and both Lopez and Rodriguez made their recommendations on that basis.  Whether or not that was the best approach, it does not suggest an intent to discriminate on the basis of age.[35]

     c.   *Training and Education*

The FOS resumes also reflected the candidates' qualifications in job training and education.  Although Pachciarz had the fewest total years in the Border Patrol, he had completed 27 Border Patrol training courses, which was more than any of the Plaintiffs (and about three times as many as Dekock or Sanchez).[36]  More significantly, Pachciarz also had completed 115 semester hours of college coursework, which put him less than a

---

[34] This is not to suggest that Plaintiffs did not "earn" their awards or that they were given for no reason.  Those ratings and recognitions reflect very favorably on Plaintiffs, and they are to be commended for achieving them, but whether those awards translate into an entitlement to promotion to the FOS position is a different matter.

[35] Once again, the issue here is not whether it was fair or the best practice (from a management standpoint) for Lopez and Rodriguez to rely heavily on their personal observations of the candidates' performance.  *Deines v. Tex. Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) (the issue is not "[w]hether the employer's decision was the correct one, or the fair one, or the best one").  Rather, the "single issue" is whether downplaying the significance of the awards listed on the candidates' resumes raises an inference that the selection was "motivated by discrimination" based on age.  *Id.*  On that critical issue, the Court concludes, after carefully assessing the witnesses' testimony and other evidence, that no inference of intent to discriminate is raised on the facts here.

[36] Dekock listed 7 job related courses completed, Sanchez listed 10, and Martinez listed 21.

semester away from a degree in criminal justice. None of the Plaintiffs had completed any significant post-High School education.[37]

While Pachciarz's training and education tend to distinguish him from the Plaintiffs, there is no evidence that the selecting and recommending officials for the FOS position gave this factor any significant weight.[38]   In addition, training and education would not be the most determinative consideration in the context of the FOS selections, since it is not clear to what extent they would enhance a candidate's ability to perform as a second level supervisor.

        d.    *Performance as First Line Supervisors*

A FOS is a second line supervisor. In weighing the candidates' qualifications to advance to a FOS position, a critical factor was how they performed as first line supervisors. All the Plaintiffs had performed well in that role, as suggested by the annual ratings listed in their FOS resumes.   But the most important assessment of their performance came from PAIC Lopez, who, as agent in charge of the McAllen Station, was tasked with evaluating all the candidates for the FOS positions and making recommendations.   Lopez had observed Plaintiffs' performance first hand over several

_____

[37]   Dekock and Sanchez both noted some (unspecified) college coursework, while Martinez listed high school education only.

[38]   Plaintiffs try to make much of Pachciarz's reference to "summa cum laude" on his resume.   While use of that term was obviously inappropriate in describing his education, it is also irrelevant to this case.   There is no evidence that any selecting or recommending official noticed it or gave it any weight; for that matter, no one seems to have taken Pachciarz's education into account at all, even though he was very close to receiving a college degree in criminal justice.   Moreover, if anyone had noticed the reference to "summa cum laude," they would not have been misled about his actual educational achievements.   In the very same place on his FOS resume, Pachciarz clearly and accurately states that he had not graduated from college and that his GPA was "2.9 out of 4.0."

years.  He recommended Plaintiffs Sanchez and Martinez for a FOS position, but with some reservations.  *See supra* note 9.  He felt that both were solid performers and that they would be "trainable" in a FOS position.  However, Lopez's first choices were Lucio and Salinas, both of whom he recommended without reservation.

A-Chief Rodriguez, who was above Lopez on the chain of command, was likewise in a position to personally assess Pachciarz's performance as a first level supervisor.  Rodriguez was well-qualified to make such an assessment, given that he had about 18 years experience in various supervisory positions at the time of the selection.  Among those supervisory positions, Rodriguez had been PAIC at the Port Isabel station when Pachciarz transferred there from another sector.   Rodriguez had almost daily contact with Pachciarz over several years and had seen Pachciarz carrying out his duties in implementing Operation Rio Grande, a major Border Patrol initiative being conducted from that station (and later Ft. Brown).  Rodriguez found that Pachciarz excelled in his performance and unqualifiedly recommended him for one of the two FOS openings.[39]

---

[39]  Plaintiffs have pointed out that Rodriguez's assessment was subjective.  The Court is aware and has considered that "subjectivity has a potentiality for abuse by those evaluators who would use it to shield improprieties in the selection process."  *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir.1993).  While it is no doubt true that Rodriguez's assessment was subjective, it was no less subjective than the ratings relied upon by Plaintiffs (and listed as "awards" on their FOS resumes).  In fact, those ratings are less helpful in comparing qualifications since there is no evidence in the record to explain why they were given at the time.  Rodriguez testified in some detail about his observations of Pachciarz's performance as a supervisor.  Plaintiffs might also point out that their appraisal ratings show that multiple prior supervisors rated them highly, but the same is also true of Pachciarz (as reflected by his early advancement to a supervisor position in another sector).

Rodriguez's assessment of Pachciarz's job performance as a first line supervisor was more favorable than Lopez's assessment of Plaintiffs' performance in that role.[40] Fortunately for Pachciarz, Rodriguez was above Lopez on the chain of command. In addition, the ultimate selecting official, Chief Underdown, had a high degree of confidence in Rodriguez and relied on his recommendations.[41]

        e.    *Cross-Pollination*

Pachciarz also benefitted from another key factor.  As noted earlier, Underdown believed that there was a significant benefit in selecting supervisors who would come in from a different station, which she called "cross-pollination."  She felt that cross-pollination would bring new ideas and ways of doing things into the stations and also aid the sector in working more cohesively to achieve its objectives.

Underdown was aware that PAIC Lopez's recommendations were all from the McAllen Station (where the FOS positions would be filled) and that Rodriguez's recommendations were from other stations.  Although cross-pollination was something neither Pachciarz nor Plaintiffs had any control over, it turned out to benefit Pachciarz in this instance.[42]  When Underdown reviewed Pachciarz's resume to confirm her decision

---

[40] It might also be argued that Lopez recommended Sanchez and Martinez over Pachciarz, since Lopez was supposed to consider all the candidates in making his recommendations.  But Lopez explained that he did not know Pachciarz and that he recommended Sanchez and Martinez based on his experience working with them (not based on their resumes).

[41] Both Plaintiffs and Pachciarz had some advantage over applicants from other stations or sectors as a result of the fact that they had worked closely with the two key recommending officials, Lopez and Rodriguez.  Ultimately, Pachciarz benefitted most from this fortuitous circumstance since Underdown adopted Rodriguez's recommendations.

[42] From papers filed with the EEOC, it is clear that Plaintiffs had anticipated that their previous experience at the McAllen Station would give them an advantage over

. . . *continued on next page.*

to adopt Rodriguez's recommendations, she noted that in addition to his experience as a supervisor at Ft. Brown Station, he had prior experience at another station in another sector, Sierra Blanca.  This circumstance further confirmed her decision to go with Rodriguez's recommendations.

After carefully considering all the evidence concerning qualifications for the FOS position, the Court finds that Plaintiffs have failed to show that they were clearly better qualified than Pachciarz such that age discrimination could be inferred from their non-selection.[43]   To the contrary, it is not clear that Plaintiffs were more qualified at all, taking into account all relevant considerations.  Plaintiffs and Pachciarz were similarly qualified, with the advantage in this selection going to Pachciarz because the key recommending official, Rodriguez, had observed him excel in the performance of his

---

applicants from other stations.  Plaintiffs emphasized that they had experience at the station where the FOS positions were being filled.  As it turned out, in light of Chief Underdown's preference for cross-pollination, their experience at the McAllen Station did not give them the advantage that they had anticipated.

[43]   The facts here are analogous to those addressed by the Fifth Circuit in another age discrimination case involving federal employees, *Eberle v. Gonzales*, 240 Fed. Appx. 622, 630–31 (5th Cir. 2007) (unpublished).  There the plaintiff, Eberle, claimed that he was clearly better qualified and more experienced than a younger employee, Brooks, who was selected for promotion to a position in the Federal Bureau of Prisons (BOP).  Specifically, Eberle claimed "that he was clearly better qualified than Brooks because he had taken over 104 classes at the BOP, *had won numerous awards*, had served as an instructor, was bilingual, and *had worked for the BOP longer than Brooks*."  *Id*. at 630 (emphasis added).  The Fifth Circuit found that "Eberle's belief that he was better qualified and had more experience than Brooks does not establish pretext"; "the differences in qualifications between Eberle and Brooks are not so widely disparate" such that age discrimination could be inferred.  *Id*.  Eberle's "subjective opinion that he was more qualified" based on his greater experience and awards was not sufficient to establish pretext for discrimination.  *Id*. at 631.  The Fifth Circuit concluded that "Eberle merely speculates that age was a factor in Defendants' selection, but such unsubstantiated assertions are not competent . . . evidence."  *Id*.  Based on the evidence presented in the instant case, the same can be said of Plaintiffs Dekock, Sanchez, and Martinez.

duties as a first line supervisor at another station. [44]  *See Price v. Fed. Express Corp*., 283 F.3d 715, 723 (5th Cir. 2002) ("Showing that two candidates are similarly qualified does not establish pretext under this standard.").

     2.    <u>Inconsistencies and False Statements</u>

Plaintiffs' also point to various alleged inconsistencies and false statements as circumstantial evidence showing pretext for age discrimination.  Each of Plaintiff's main points will be addressed.

     a.    *Cross-Pollination*

Plaintiff's argue that the consideration of "cross-pollination" was an after-the-fact attempt to justify the selection of a lesser qualified candidate.  They point out that the cross-pollination rule was not followed in the very next FOS position that was filled; specifically, Melissa Lucio was chosen for the next FOS position even though it was located at the same station where she was already assigned.

The record does not support Plaintiffs' claim that there has been any significant inconsistency regarding cross-pollination.  In her very first statement to the EEOC investigator, Chief Underdown explained her preference for cross-pollination in responding to a question about why Pachciarz and Alvarez were selected rather than the Plaintiffs.  She stated: "It is not automatic that someone from the Station where the FOS position is being filed will be chosen.  It is often beneficial to the Service to bring in

---

[44]  This is not to say that reasonable people might not come to different conclusions on who was most qualified, but rather that the circumstances here do not suggest that age discrimination was a motivating factor.

someone from other Stations who will have new ideas and different perspectives that can bring a balance to the operations." She gave essentially the same explanation at trial.[45]

Nor does the selection of Lucio for the next open FOS position establish any inconsistency. Underdown never suggested that cross-pollination was an absolute rule; rather, she stated that it was "often beneficial" and was a preference that should be considered. In addition to the two FOS positions at issue here (filled by Pachciarz and Alvarez), evidence was presented at trial concerning three subsequent FOS openings, which were filled by Lucio, Salinas, and Plaintiff Martinez (in that order). Consistent with Underdown's preference for cross-pollination, four of those five positions were filled by someone coming in from a different station.[46] The only exception was Lucio.[47] An 80% rate of cross-pollination does not suggest any inconsistency.

---

[45] Plaintiffs suggest that Underdown's trial testimony about cross-pollination is different from what was said during the EEOC proceedings. At trial, Underdown described meetings with her senior staff in which she expressed her preference for cross-pollination in filling supervisor positions within the sector. When Plaintiffs' counsel suggested that she had not mentioned discussing cross-pollination with senior staff in her EEOC statement, Underdown responded that she was not asked. This appears to be correct; there was no reason for her to mention her discussions with senior staff in responding to the question about why she chose Pachciarz and Alvarez. Given her preference for cross-pollination (which she has consistently maintained), it is hardly surprising that she would have discussed this with her senior staff.

[46] Salinas and Plaintiff Martinez were both selected for FOS openings at other stations.

[47] No evidence was presented at trial about the other applicants who applied for the FOS position that went to Lucio, so it is unknown whether there was a viable candidate from another station. In addition, PAIC Lopez highly recommended Lucio for the FOS positions at issue here, and it may well have been that her qualities as a first line supervisor were deemed to override the preference for cross-pollination for that position. Such a conclusion would not have been inconsistent with Underdown's desire to take into account the benefits of cross-pollination in making a selection.

b.    *Use of a Matrix*

Plaintiffs also argue that there was inconsistency in the use of a "matrix."  They state that Underdown's policy for using a matrix was not followed (by Rodriguez in particular), and they suggest that it is suspicious and unfair that the matrix used by Lopez could not be found.

When Underdown arrived in the Rio Grande Valley Sector, she instituted the practice of using a matrix, which she had found to be a useful tool during her tenure as chief in Miami.  The FOS positions at issue here were posted very soon after Underdown had arrived in the sector from Miami, and these were the first supervisory positions that were filled during her tenure as chief.[48]  As such, it should not be too surprising if the practice of using a matrix was not fully implemented in making these initial FOS selections.  In fact, Lopez stated that the use of a matrix became more common in later selections.

As Underdown explained it, a matrix would be created by the patrol agent in charge (PAIC) at the station where the position would be filled.  This was to be done with input from the assistant chief (A-Chief) with responsibility over that station.

The Chief's practice was followed in part in this instance.  PAIC Lopez did prepare a matrix with the help of his station assistant.  However, Lopez did this without input from A-Chief Rodriguez, who confirmed that he did not assist Lopez with the

---

[48]  Although there was some conflicting evidence, Underdown testified that she arrived on duty at the Rio Grande Valley Sector in April 2005, which was only a month before the openings for FOS positions were posted (in May 2005).

matrix and that he did not use one himself.[49]   Rodriguez was aware of Underdown's preference for use of a matrix, but he understood the use of a matrix to be optional. Importantly, Rodriguez reviewed the applicants' resumes, which was the raw data that would be summarized in any matrix.

As can be seen, there is some discrepancy between Underdown's and Rodriguez's positions on the use of a matrix.  Underdown seems to have viewed using a matrix as sector policy, while Rodriguez viewed it as optional for those who found it helpful.  It is also clear that Underdown's matrix policy was not followed to the letter for these first supervisor selections during her tenure.

Plaintiffs seem to contend that Rodriguez's failure to use a matrix somehow enabled him to get around the selection of the candidates who were most qualified to be a FOS at the McAllen Station.   The evidence does not support such an inference. Underdown emphasized that the matrix was merely an informal tool to summarize relevant information from the resumes; it could take any form and contain whatever information the relevant supervisors found helpful.   A matrix could not magically transform subjective evaluations about candidates' performance and capabilities into a scientific equation.  If Rodriguez wanted to manipulate the results of the selection (which there is no evidence to support), he could just as easily have done it by creating a matrix that reflected the outcome he desired.[50]

---

[49]   Underdown's suggested use of a matrix contemplated the creation of one matrix by the PAIC, which would then presumably be available for use by others in the selection process.  The fact that Rodriguez did not create his own matrix was not inconsistent with Underdown's suggested approach.

[50]   In fact, this argument was made by Plaintiffs during the EEOC process, as reflected by the EEOC records they submitted as evidence.  Plaintiffs initially

. . . *continued on next page.*

Nor is it significant that the matrix created by Lopez cannot be found.  Because the matrix was an informal local tool, Underdown did not believe that it was required to be kept as part of the official selection record.  There is nothing nefarious about the fact that it cannot be found.  Perhaps more importantly, none of the officers who had any involvement in the selection process claims to have relied on Lopez's matrix, including Lopez himself.  Plaintiffs have not been deprived of a document on which they were judged because no one based their decision on Lopez's matrix.  Plaintiffs also have available the candidates' resumes, which contain the information that would have been summarized in a matrix.  Other than pointing to their experience and awards (which they have already done), Plaintiffs do not suggest how a matrix based on the resumes would have dictated a different result.[51]

> c.   *Planning Operation Rio Grande*

Plaintiffs contend that Rodriguez blatantly falsified Pachciarz's work experience in an attempt to make him appear more qualified.  They challenge the following statement made by Rodriguez to the EEOC: "Mr. Pachciarz was instrumental in the planning of a major enforcement operation, Operation Rio Grande, and provided direct supervision during its implementation."  Plaintiffs point out that Operation Rio Grande started in 1997.  Because Pachciarz did not arrive at Port Isabel and become involved in

---

complained about the use of a matrix because, they said, a matrix could be manipulated to achieve a desired result.  Now Plaintiffs appear to complain because Rodriguez did *not* use a matrix.

[51]  The Court's bullet-point summary of qualifications taken from the resumes would appear to fall within Underdown's broad definition of what would constitute a matrix (at least in comparing Plaintiffs and Pachciarz).  *See supra* Part II. B.1.  While such a summary may help in organizing the relevant information, it does not determine the outcome.

the operation until 2001, he could not have been involved in the initial planning for the operation that occurred four years earlier.

While the wording of Rodriguez's statement could be interpreted as Plaintiffs suggest, Rodriguez later explained what he meant, both in writing to the EEOC and at trial. Operation Rio Grande was a major initiative to control the volume of illegal aliens and narcotics crossing the border from Mexico into southern Texas. It spanned a number of years, and during that time it required frequent adjustments in strategy and allocation of resources to respond to changes in the flow of aliens and drugs. Rodriguez explained that Pachciarz was involved on a day-to-day basis in planning and carrying out the objectives of Operation Rio Grande in response to the conditions at the time. Pachciarz also assisted in planning and executing the movement of agents and equipment from the Port Isabel Station (where the operation was being conducted) to the new Ft. Brown Station (located much closer to the border). The opening of the Ft. Brown Station also involved numerous visits and inspections by dignitaries (including the U.S. Attorney General and the U.S. Senators from Texas), which Pachciarz also helped coordinate.

After hearing Rodriguez's testimony and observing his demeanor, the Court finds his explanation to be credible. Rodriguez knew well (from his own direct involvement as PAIC at Port Isabel Station) that the operation had started years before Pachciarz became involved, and he was also well aware (and would know that others would be well aware) that the initial planning for such a large-scale operation would have been done by more senior managers from the Border Patrol and other law enforcement agencies. If Rodriguez had intended to falsify Pachciarz's qualifications in order to cover up his own age-based discriminatory intent, surely he would have come up with something that could

not be so easily shown to be false. The more likely explanation is that Rodriguez's EEOC written response was unartful and that what he meant was that Pachciarz was involved in planning and implementing Operation Rio Grande as it was being carried out. There is no evidence to call into question Pachciarz's daily involvement with Operation Rio Grande while he was stationed at Port Isabel and Ft. Brown, and it is unremarkable that his activities would include planning on how to carry out the objectives of the operation.[52]

> d.    *Based on the Resumes*

Plaintiffs contend that Rodriguez's statement to the EEOC that he chose Pachciarz over them "based on the resumes" is not credible because the resumes do not show that Pachciarz was better qualified. Plaintiffs further contend that Rodriguez's failure to take steps to contact their supervisors for additional information about their performance was unfair. They argue that this evidence shows that his selection of Pachciarz was a pretext for age discrimination.

The Court agrees with Plaintiffs that, *if* Rodriguez claimed that his decision was based solely on the resumes, it would not be credible because Pachciarz cannot be said to be better qualified based solely on the face of the resumes. However, Rodriguez's statements to the EEOC, taken together (rather than piecemeal), make clear that his recommendations were not based solely on the resumes.

---

[52] Plaintiffs seem to argue that the word "planning" as used in the context of a Border Patrol operation must only relate to the overall pre-operation planning stages, as opposed to planning that may be needed along the way to carry it out. Such semantic quibbling is not persuasive.

In Rodriguez's initial EEOC response to the question asking why he recommended Pachciarz and Alvarez, Rodriguez stated that it was based on "[t]heir performance at that time."  He explained: "I had daily contact with Mr. Pachciarz and had seen him perform at a top level on a first hand basis."  Likewise, he had observed Alvarez perform numerous tasks "exceptionally well."

When Rodriguez was asked in the next question why he did not choose the Plaintiffs, he responded: "It was my opinion, based on the resumes, that both Mr. Pachciarz and Mr. Alvarez had demonstrated better performance capabilities and were better qualified than [Plaintiffs]."  When the EEOC investigator later asked Rodriguez to explain how Pachciarz was better qualified based on the resumes (given that Plaintiffs' resumes showed more experience and awards), Rodriguez explained (again) that he had considered his "personal experience" with Pachciarz as a supervisor and that he had "first hand knowledge of [his] performance capabilities."  Rodriguez pointed out that he had "no personal knowledge" regarding Plaintiffs.

Rodriguez thus made it clear from the beginning that his recommendations of Pachciarz and Alvarez were based primarily (if not exclusively) on his personal experience working with the candidates.  Both Chief Underdown and Deputy Chief Garza confirmed that during their meeting with Rodriguez to discuss the FOS positions, Rodriguez emphasized his experience working with Pachciarz and Alvarez in explaining why he chose them.  Rodriguez's trial testimony was consistent with what he said in the course of the EEOC proceedings; namely, that his recommendations were based mainly

on his personal assessment of Pachciarz's and Alvarez's performance.[53]   Moreover,
Rodriguez's selection of Alvarez, the second oldest candidate of the 23 applicants, further
supports the conclusion that he selected both Pachciarz and Alvarez based on his personal
observation of their performance, not their age.[54]

Plaintiffs also criticize Rodriguez's failure to take further steps to investigate the
qualifications of the candidates, especially those who he did not have significant
experience working with.  In particular, Plaintiffs suggest that it would have been fairer if
Rodriguez had contacted the supervisors of those other candidates in order to better
compare their performance as first line supervisors with his knowledge of Pachciarz's
performance.

---

[53]  It is unclear why Rodriguez also made the statement to the EEOC that he did
not choose Plaintiffs "based on the resumes."  Whatever the reason, based on all the
evidence (including the Court's assessment of Rodriguez's credibility at trial), it was not
an attempt to hide age discrimination.  Perhaps it was another case of an unartful written
response.  The response is somewhat ambiguous since Rodriguez refers in the same
sentence to both "the resumes" and to Pachciarz's "demonstrated better performance
capabilities."  Did Rodriguez mean that Pachciarz "demonstrated better performance
capabilities" on paper alone or that Pachciarz's actual performance outweighed Plaintiffs'
resumes?  Perhaps also Rodriguez's reference to the resumes reflects some reluctance to
fully acknowledge that his decision was based almost entirely on his own personal
experience in working with certain candidates, which might be perceived as an unreliable
approach or one that was unfair to candidates, like Plaintiffs, who he had not worked
closely with.  Ultimately, the reason for Rodriguez's reference to Plaintiffs' resumes is
only relevant if it amounts to circumstantial evidence that he was attempting to hide age
discrimination.  For the reasons stated, it does not.

[54]  Plaintiffs' state that Rodriguez chose Alvarez as his "ace in the hole" to cover-
up his intent to discriminate against Plaintiffs based on their age.  But this is pure
speculation.  Plaintiffs acknowledge that they know nothing about Rodriguez personally
to suggest that he would engage in age discrimination.  If Rodriguez was truly motivated
by an intent to discriminate based on age, he could have just as easily carried out a cover-
up (and more effectively carried out a discriminatory purpose) by choosing someone who
was substantially younger than Alvarez but still in the protected class.

To some extent this argument overlooks the procedure in place for filling FOS positions.  Rodriguez's actions appear consistent with the expectation that Lopez, as the patrol agent in charge of the McAllen Station, was principally responsible for reviewing, gathering, and organizing information about all the candidates.

Plaintiffs' argument also does not take into account that Rodriguez was qualified by his own extensive supervisory experience (spanning 18 years) and by his position (as Chief Underdown's senior staff person with responsibility over the McAllen Station) to feel justified in concluding that he knew what was needed for the McAllen FOS positions and that Pachciarz and Alvarez had demonstrated to his satisfaction those qualities.

Perhaps reasonable people could differ about whether Rodriguez's decision-making process was ideal from a management perspective or whether it was the most fair way to handle the selection, but, as already noted, this is not a forum for second-guessing an employer's decisions or for enforcing someone's notion of workplace fairness.  *See e.g.*, *Walton v. Bisco Industries, Inc.*, 119 F.3d 368, 372 (5th Cir. 1997) ("the discrimination laws [are not] vehicles for judicial second-guessing of business decisions").  Again, the sole issue is whether Plaintiffs were not selected because of their age.

Based on all the evidence, neither Rodriguez's statement about the resumes nor his failure to take any other steps to investigate the candidates suggests age discrimination.  Perhaps most significantly, the Court finds credible Rodriguez's trial testimony that he was not motivated by age discrimination.[55]

---

[55] The credibility of Plaintiffs' testimony is not a factor on this issue.  None of the Plaintiffs has had any significant dealings with Rodriguez, and they all acknowledge that

. . . *continued on next page.*

e.      *Consideration of Lopez's Recommendations*

Plaintiffs also point to the following statement made by Rodriguez to the EEOC:

I transmitted my recommendations and PAIC Lopez' recommendations to
Deputy Chief Garza.  My recommendations were made in addition to
PAIC Lopez' recommendations.  They did not replace PAIC Lopez'
recommendations.

Plaintiffs claim that this statement was false or misleading, as shown by evidence
suggesting that Rodriguez may have also affirmatively stated to Underdown and Garza
the reasons he believed that his choices were better.  Plaintiffs also complain that, in
effect, only Rodriguez's recommendations were actually considered by Underdown.

It should first be noted that—consistent with Rodriguez's statement to the
EEOC—Underdown and Garza both confirmed that Rodriguez did in fact submit both his
own recommendations and Lopez's recommendations.  Underdown was certainly aware
of Lopez's recommendations, and it cannot be disputed that, as chief, she could have
adopted those recommendations if she chose to do so.  On the other hand, it is also true
that Garza concurred in Rodriguez's recommendations, and Underdown thus viewed the
names submitted by Rodriguez to be the recommendations from her senior staff
(Rodriguez and Garza).  While Rodriguez's statement to the EEOC may be read to
suggest that he submitted his and Lopez's recommendations to Garza on equal footing,
the difference between that and Underdown's perspective (that her senior staff was
ultimately recommending two names) is not an inconsistency that suggests some ulterior
motive in the selection.

---

they know nothing about him to suggest that he would engage in age discrimination.
Rather, Plaintiffs speculate that he must have discriminated based on age since—in their
view—they were so much better qualified than one of the two people selected.

Underdown and Garza both confirmed that Rodriguez emphasized his personal experience with Pachciarz and Alvarez in recommending them (rather than focusing on any criticism of Lopez's choices).   Whether or not Rodriguez may have also said something about why his choices were better than Lopez's is not the type of inconsistency upon which an inference of age discrimination could be gleaned.   It would have been obvious from the mere fact that Rodriguez made different recommendations that he felt that Lopez's recommendations should not be followed.   To the extent there is some inconsistency about specifically what was said, it is not significant that three participants in a routine meeting (at the time) may not have the same recollection about what was at most a brief reference to the other candidates.

f.      *Checkpoint Experience*

Plaintiffs argue that Underdown's and Rodriguez's reliance on Pachciarz's experience in working at the Sierra Blanca checkpoint also shows pretext for discrimination.   At trial, Plaintiffs downplayed the significance of Sierra Blanca as a particularly busy checkpoint and pointed out that their comparable experience was ignored.   For example, Plaintiff Martinez's prior experience included work at Las Cruces Station in New Mexico (which had three checkpoints), and Plaintiff Dekock had checkpoint experience at the El Centro Station in California (which also had three checkpoints).

Pachciarz's experience at Sierra Blanca was noted by both Rodriguez and Underdown.   When Rodriguez was asked by the EEOC why Pachciarz's checkpoint experience was more significant than Martinez's, he responded that the two had "similar experience in checkpoint operations" but that Pachciarz had experience at a busy

checkpoint location "as a supervisor," while Martinez was not a supervisor when he worked at Las Cruces Station.[56]  This distinction is not unreasonable given that the FOS position involved a higher level of supervision.  In addition, while Rodriguez mentioned Pachciarz's experience at Sierra Blanca, he consistently emphasized (as already discussed) that the principal basis for his selection was his own experience working with Pachciarz at the Port Isabel/Ft. Brown Stations.

Underdown also noted Pachciarz's experience at Sierra Blanca in reviewing his resume.  But she did not purport to be comparing his experience with the Plaintiffs; to the contrary, she read only the resumes of the two candidates who Rodriguez recommended, Pachciarz and Alvarez.  Underdown wanted to insure that their experience and qualifications were consistent with her vision for the sector.[57]  She felt that Pachciarz's experience as a supervisor at the Sierra Blanca checkpoint would further enhance his effectiveness in the McAllen FOS position.  While Plaintiffs are not impressed with the significance of working at the Sierra Blanca checkpoint, Underdown had actually worked there (unlike Plaintiffs) and believed that it was a positive factor in confirming her decision to adopt Rodriguez's recommendations.

---

[56] The same is also true of Plaintiff Dekock's checkpoint experience; he was likewise not a supervisor at the time.

[57]  Underdown explained that she read the resumes of Pachciarz and Alvarez to confirm her decision to adopt Rodriguez's recommendations.  Plaintiffs also criticize Underdown's failure to read their resumes.  Perhaps if she had unlimited time, Underdown would have read all 23 resumes and done further independent investigation of each candidate (not just the Plaintiffs).  However, given that she was chief of an entire Border Patrol sector with over 1500 employees, it was entirely reasonable for Underdown to rely on the recommendation of a trusted senior staff member.

Here again, Plaintiffs complaints about the reasons given for Pachciarz's selection are not substantial and do not suggest that age discrimination was the real reason for their non-selection.

g.     *Plaintiffs' Other Theories*

In attempting to prove age discrimination, Plaintiffs have pointed to alleged inconsistencies in Defendant's reasons for selecting Pachciarz.  Ultimately, however, it is not enough merely to show inconsistencies in the employer's explanation: "the factfinder must *believe* the plaintiff's explanation of intentional discrimination."   *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (emphasis in original).   In making that determination, the consistency of Plaintiffs' own statements has some relevance.

According to Plaintiffs' theory at trial, their non-selection must have been age discrimination because they were clearly better qualified than Pachciarz.  Yet two of the Plaintiffs (Sanchez and Martinez) previously stated to the EEOC that they were not chosen for the FOS position due to a "fued" between Lopez and Rodriguez; in fact, they characterized themselves as "causalities of war."   Plaintiff Martinez also reported the rumor that Pachciarz was chosen because he was a "drinking buddy" with the PAIC at Ft. Brown (where Pachciarz was stationed).

Apart from the fact that there does not appear to be any evidence supporting these theories (other than the same circumstantial evidence upon which Plaintiffs now rely), they would tend to *disprove* Plaintiffs' age discrimination allegation because they suggest that Plaintiffs' non-selection was based on something other than their age.   While Plaintiffs did not mention these other theories during their trial testimony, their previous

statements about them tend to cast doubt on the believability of their age discrimination theory.[58]

In sum, after carefully considering all the circumstantial evidence suggested by Plaintiffs, including the cumulative effect of all that evidence, the Court is left with the firm conclusion that Plaintiffs have failed to prove that their non-selection was the result of intentional age discrimination.  To the contrary, the credible evidence shows that the decision made by Chief Underdown and A-Chief Rodriguez to select Mr. Pachciarz and Mr. Alvarez was based on their good faith assessment (whether flawed or not) of the best candidates for those FOS positions at that time.

### III. CONCLUSION

Based on the foregoing findings and conclusions, Plaintiffs' age discrimination claim lacks merit and will be denied.  A judgment consistent with these findings and conclusions will be separately entered.

The Clerk shall provide a copy of these Findings of Fact and Conclusions of Law to counsel for the parties.

DONE at McAllen, Texas on June 9, 2009.

_Peter E. Ormsby_
Peter E. Ormsby
United States Magistrate Judge

---

[58]   Plaintiffs stated these other theories to the EEOC.  During closing argument at trial, Defendant's counsel pointed out Plaintiffs' prior inconsistent rationales for their non-selection.  Counsel for Plaintiffs objected on the basis that those statements were not in evidence.  The Court agreed that the statements had not been brought out during the trial testimony.  However, after reviewing the EEOC records admitted as exhibits at Plaintiffs' request, it is apparent that the referenced statements by Plaintiffs are in evidence and accordingly have been considered.

47